IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | Case No. 2:14-CV-00396 |
| Plaintiff, | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| v. | : | |
| | : | Magistrate Judge King |
| DOUGLAS E. COWGILL and PROFESSIONAL INVESTMENT MANAGEMENT, INC., | : : : : | |
| Defendants. | : | |

**OPINION & ORDER**

On September 21, 2015, this Court issued an Order approving the Receiver's recommendations relating to the procedure for valuation of the Professional Investment Management, Inc. ("PIM") accounts. (Doc. 58.) As part of this procedure, all Plan Fiduciaries and individual account holders were given an opportunity to object to the Receiver's valuation. (*Id.* at 2.) Out of four Objections filed, the Receiver was able to resolve all but one: that of Midwest Physician Anesthesia Services, Inc. ("MPAS"). The Court held a hearing on December 18, 2015 to address the Objection. For the reasons that follow, the Court **OVERRULES** MPAS's Objection.

I.     BACKGROUND

The Court appointed the Receiver, Michael P. O'Grady, on May 20, 2014 and ordered him to operate the business of PIM and to analyze and recommend the most equitable method of allocating the loss to Plans and individual account holders that was caused by Defendant Douglas E. Cowgill's fraudulent conduct. (Report of Receiver, Doc. 59 at 2.) At that time, the Court also ordered a freeze of all assets of PIM until further order of the Court. (*Id.*)

1

On September 21, 2015, upon submission of the Receiver's Report, the Court approved the Receiver's recommendations relating to the procedure for valuation of the PIM accounts. (Order Adopting Receiver's Report, Doc. 58.)  The Court ordered the Receiver to give notice to each Plan or individual account holder of the Receiver's valuation of all accounts and the amount of loss to be allocated to the Plan or individual account holder.  (*Id.* at 2.)  The Court set a date of November 6, 2015 for any Plan or individual account holder to make a written objection to the Receiver's valuation.  (*Id.*)  The Receiver and the Objector were then granted until December 4, 2015 to resolve any Objection.  (*Id.*)  The Receiver met with many interested parties and answered their questions about the valuation of accounts.  Four objections were filed, three of which were resolved by the designated deadline.  Because MPAS and the Receiver were unable to resolve MPAS's objection, the Court scheduled a hearing for December 18, 2015.  The Court heard arguments from the Receiver, MPAS, and Plaintiff Securities and Exchange Commission ("SEC").  MPAS objects to the Receiver's total loss and loss allocation calculations.  The SEC indicated its support for the Receiver's method of calculating both the total loss and the loss allocation.

## II.  ANALYSIS

The Receiver calculated the total loss based on the difference between the total assets that PIM had reported as under its control on the benchmark date and the actual amount of assets under PIM control on that date. (Doc. 59-1 at 9.)  The parties agree that June 30, 2014 is the appropriate benchmark date to calculate total losses because it is the date of the issuance of the quarterly statement closest to the beginning of the Receivership. (*Id.*; Doc. 67 at 3.)  The Receiver's methodology yielded a total loss calculation of $964,767.99. (Receiver's Proposal

for Allocation of Investor Holdings and Associated Losses at PIM ("Dupont Report"), Doc. 59-1 at 11.)

The Receiver's Report then laid out three options from which the Court could choose to allocate the loss. (Doc. 59-1 at 14.) The first, allocation by total holdings, would calculate the percentage of total PIM assets each Plan holds, and then allocate that loss among the account holders by percentage. (*Id.*) The second, allocation by cash holdings and cash equivalents, would calculate the percentage of cash held by each Plan and allocates the loss by that percentage. (*Id.*) The third, allocation by co-mingled (pooled) holdings, would calculate the percentage of the pool of assets of money under PIM's control held by each Plan and allocate the loss by that percentage. (*Id.*) The Receiver recommended that the Court select the second option, allocation by cash holdings and cash equivalents, and the Court adopted this recommendation. (*See* Order Adopting Receiver's Report, Doc. 58.) MPAS now objects that the total loss calculation was incorrect and that the loss allocation was inequitable.

### A. Total Loss Calculation

MPAS contends that the total loss calculation was based on guesswork and that the Receiver should have used the same total loss figure that the SEC used for its disgorgement action. (Doc. 67 at 4.) MPAS asks the Court to set the total loss amount at $840,847.42, which is the amount that the SEC concluded that Cowgill misappropriated, because this figure was based on objective evidence of the funds that Cowgill transferred from one of PIM's omnibus accounts, the Fifth Third Account, to his own accounts.

The Receiver argues that its method of calculating total loss is preferable because the SEC's calculation was for purposes of its disgorgement action and, therefore, considered how much money Cowgill actually misappropriated, looking at only one account (the Fifth Third

3

account) to do so. On the other hand, the Receiver's method sought to measure the amount of investor losses, not the amount with which Cowgill actually absconded. The Receiver's method also took into account the amount that was manipulated across three omnibus accounts: Fifth Third, SEI, and State Street. Importantly, at the hearing, the SEC supported the Receiver's method of calculating the total loss on the ground that the disgorgement amount is distinct from the amount of investor losses. Based on the reasoning of the Receiver and the SEC, the Court finds that the Receiver's total loss calculation of $964,767.99 was reasonable.

### B. Allocation of Losses

MPAS next requests that the loss be allocated *pro-rata* at the Plan level across the co-mingled assets (cash and securities) under PIM control as of the benchmark date of June 30, 2014, which was the third option presented by the Receiver. (Doc. 67 at 7.) MPAS asserts that ignoring securities holdings in calculating loss allocation leads to an inaccurate and inequitable result.

The Court is not persuaded by this argument. The Receiver maintained in the Dupont Report that this approach would be neither equitable nor feasible, because it would entail liquidating holdings from certain plans to contribute to holdings of other plans and would also lead to potential tax ramifications that would confuse the process. (Doc. 59-1 at 1.) Allocation by co-mingled holdings would also delay the winding down of the Receivership as it would involve liquidating third party assets and selling securities, rather than taking into account only cash, which is simpler to distribute. (*Id.* at 14.) At the hearing, the SEC also endorsed this method of loss allocation as the most efficient and fair under the circumstances. The Receiver has also noted in its Report that plan fiduciaries failed to fulfill certain duties, which made Cowgill's fraud possible and that, therefore, plan participants may have causes of action against

4

their plan fiduciaries or may be protected by fidelity bonds at the plan level to compensate for their losses.  (*Id.* at 2.)  Additionally, in recommending that the Court not select the option to allocate losses by co-mingled holdings, as MPAS would prefer, the Receiver also pointed out that the loss to MPAS under its calculation is *de minimis*.  Indeed, it represents only percent of MPAS's total holdings.  Electing allocation by co-mingled holdings would likely save MPAS only one-quarter of one percent of its total holdings.  Therefore, the Court finds that the approach of allocation by cash holdings and cash equivalents is more equitable and easier to administer than the other options.

Finally, the Court agrees that sustaining MPAS's Objection and adopting a new method of calculating total loss and loss allocation would result in additional delay because the Receiver would have to send out additional notices and offer the opportunity for additional objections.  This would result in a delay in winding down PIM and unfreezing the assets and lead to additional assessments of fees on Plans and individual account holders.

### III.   CONCLUSION

Finding that the Receiver calculated the total loss and loss allocation in an equitable and efficient manner, the Court **OVERRULES** MPAS's Objection.

**IT IS SO ORDERED.**

                                                        s/ Algenon L. Marbley  
                                                   **ALGENON L. MARBLEY**  
                                                   **UNITED STATES DISTRICT JUDGE**

**DATED:  December 22, 2015**